# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMVETS POST NO. 2, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | C.A. No. S23A-05-002 MHC |
| | ) | |
| THE DELAWARE BOARD OF | ) | |
| CHARITABLE GAMING, | ) | |
| | ) | |
| Appellee. | ) | |

## OPINION AND ORDER
Submitted: October 26, 2023
Decided: January 22, 2024

*On Appeal from The Delaware Board of Charitable Gaming,*
**AFFIRMED IN PART, REMANDED IN PART.**


Richard E. Berl Jr., Esquire, Hudson, Jones, Jaywork & Fisher, LLC, Lewes, Delaware. *Attorney for Appellant AmVets Post No. 2.*


Kemba S. Lydia-Moore, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for Appellee the Delaware Board of Charitable Gaming.*


**CONNER, J.**

## I.  INTRODUCTION

Appellant AmVets Post No. 2 ("AmVets") appeals from the April 26th, 2023 Disciplinary Order on Remand from Superior Court of the Delaware Board of Charitable Gaming ("Board").  The Court has reviewed the parties' submissions, the record below, and the relevant law.  For the reasons set forth below, the Board's decision is **AFFIRMED IN PART AND REMANDED IN PART.**

## II.  PROCEDURAL BACKGROUND

A full recitation of the factual and procedural background of this matter can be found in this Court's prior Order and Opinion.[1]  In short, this matter has been ongoing since 2018 when AmVets, "a 501(c)(19) organization located in Millsboro, Delaware, filed an application with the Board to play 'Hotshots'.…"[2]  This triggered an investigation whereafter the State of Delaware filed complaints with the Board against AmVets.  The Delaware Division of Professional Regulations ("DPR") held hearings on the matter at which the hearing officer found multiple violations were committed by AmVets.  The Board adopted the hearing officer's findings and on February 23, 2022, issued an order imposing discipline on AmVets.

---

[1] *AmVets Post No. 2 v. Delaware Bd. of Charitable Gaming*, 2023 WL 166272, at *1 (Del. Super. Ct.).
[2] *AmVets Post No. 2*, 2023 WL 166272, at *1.

Many of the violations were related to AmVets use of progressive jackpots. A progressive jackpot, much like the award in Powerball and Mega Millions, is a jackpot that continues to grow until a winner is drawn, resulting in an increasing award over time.[3] AmVets appealed the Board's 2022 disciplinary order to this Court arguing in part that progressive jackpots were not prohibited by the Delaware Constitution. In its January 2023 Opinion and Order, this Court affirmed in part and remanded in part the Board's 2022 disciplinary order.[4]

On March 22nd, 2023, the Board held oral arguments on remand from this Court's January 2023 Opinion and Order. On April 26th, 2023, the Board issued a disciplinary order on remand that attempted to comport with the language of this Courts January 2023 Opinion and Order. AmVets's appealed the Board's April 26th, 2023 disciplinary order on remand on May 16th, 2023. That appeal is the matter presently before the Court.

---

[3] Power Ball and Mega Millions are analogized here only to demonstrate how a progressive jackpot scheme works. This analogy is not intended to suggest that charitable organizations may operate progressive jackpots by virtue of the fact that Power Ball and Mega Millions are permitted. Unlike AmVets, which is allowed to conduct gaming as a charitable organization, Power Ball and Mega Millions are lotteries under state control. State run lotteries derive their power from Del. Const. art. II § 17, whereas charitable organizations derive their power to conduct gaming from Del. Const. art. II § 17B. Therefore, state run lotteries and charitable gaming are governed under an entirely different set of laws.

[4] *AmVets Post No. 2*, 2023 WL 166272, at *1.

**A.     The Board's Findings of Fact and Conclusions of Law**

The Board's Findings of Fact

1.     AmVets operation of Mad Dog in 2020 was not a free game because it cost five dollars to participate.

2.     AmVets operation of Mad Dog in 2020 was not a raffle because it did not contain the attributes of a raffle set out in Title 28, Chapter 15, Subchapter VII of the Delaware Code.

3.     AmVets operation of Mad Dog in 2020 with a progressive jackpot was illegal because progressive jackpots are not expressly permitted by the Board of Charitable Gaming's enabling statute and implementing regulations and therefore was subject to Delaware's general prohibition on gambling.

The Board's Conclusions of Law

1.     "That a fine of $1,000 be imposed against AmVets for a single violation of Board Regulation 11.1 on September 4, 2018 (in Complaint #23-03-17);

2.     That a fine of $1,000 be imposed against AmVets for violations of 28 *Del. C.* §1521(a)(1) and (4) during each of the six games played in February 2020 for a total of 12 violations, or $12,000 in fines (in Complaint #22-02-20);

3.     That a fine of $1,000 be imposed against AmVets for violations of 28 *Del. C.* §1521(b) ~~and Board Reg. 9.1~~ during each of the six games played in February 2020 for a total of 6 violations, or $6,000 in fines (in Complaint #22-02-20);

4

4.     That a fine of $1,000 be imposed against AmVets for a violations of Board Regulation 11.1 during each of the six games played in February 2020 for a total of 6 violations or $6,000 in fines (in Complaint #22-02-20);

5.     That a fine of $1,000 be imposed against AmVets for violations of Board Regulation 11.4[.]3 during each of the six games played in February 2020 for a total of 6 violations or $6,000 in fines (in Complaint #22-02-20);

6.     AmVets shall pay the total fine of ~~$37,000.00~~ $31,000 and the fine shall be received by DPR no later than 120 days after the mailing date of this Order;

7.     That AmVets ~~and its affiliates are~~ is unsuitable for licensure or permitting by the Board and shall be barred from obtaining any license, permit, or other approval issued by the Board until the later or 1) the date of full payment of the fine amount, and 2) the passage of 1 year from the mailing of this Order. ~~Such declaration of ineligibility is extended to include, in addition to AmVets, any of its subsidiary organizations, its parent organization and any other organization having a common parent organization or otherwise affiliated with AmVets, when in the Opinion of DPR or the Board, the circumstances of the requests warrants such action;~~

8.     That this order constitutes a public disciplinary action and a copy of it shall be served personally or by certified mail, return receipt requested, upon

AmVets. A copy of the hearing officer's Recommendation shall be attached hereto and incorporated herein as modified by this order."[5]

### B. AmVets Arguments on Appeal

1.  The Board did not explain why Mad Dog and progressive jackpots were unconstitutional.

2.  The Board failed to explain why Mad Dog violated Board Regulation 11.4.3.

3.  The Board did not address the issue of whether or not penalties originally imposed were excessive.

4.  Such other grounds as may become apparent from a review of the transcripts of the Board's hearings and deliberations.

## III.    STANDARD OF REVIEW

This Court has jurisdiction to hear appeals from the Board pursuant to the Delaware Administrative Procedures Act.[6]  The Court's review is "limited to a determination of whether the [Board's] decision was supported by substantial evidence on the record before the [Board]."[7]  When factual determinations are at issue the Court must "take due account of the experience and specialized competence

---

[5] *Bd. of Charitable Gaming Order on Remand from Del. Super. Ct.*, (April 26th, 2023).
[6] 29 *Del. C.* §§ 10102, 10142, 10161.
[7] *United Water Del., Inc. v. Public Serv. Comm'n*, 723 A.2d 1172, 1173-74 (Del. 1999).

of the [Board] and of the purposes of the basic law under which the [Board] has acted".[8]  But, if the Court determines that the record is insufficient to support the Board's conclusions, the Court shall remand the case to the Board for further proceedings on the record.[9]

## IV.  DISCUSSION

**A.  The Board's decision that AmVets operation of "Mad Dog" in 2020 was not a "free game" because it cost five dollars to participate is supported by the evidence on the record before the Board.**

Twice during the November 2021 deliberations AmVets Commander Earl Heffline testified that the 2020 games of Mad Dog operated by AmVets required five dollars to play.[10]  This information was on the record before the Board and their counsel cited to this during her presentation during the 2023 deliberations.[11]

By further citing to the record, the Board's counsel clarified as to why there was any confusion about the 2020 game of Mad Dog being free in the first place.[12]  Counsel explained, "…in the hearing officer's recommendation at the bottom of [page] 45 carrying over to 46, the hearing officer does make mention of Mad Dog

---

[8] 29 *Del. C.* § 10142(d).
[9] 29 *Del. C.* § 10142(c).
[10] Nov. 2021 Tr. at 99; Nov. 2021 Tr. at 129-132.
[11] Mar. 2023 at Tr. at 28-29.
[12] *Id.*

being a 'free game.' But if you look at the document closely, that is in the discussion of the 2018 gaming event. We are here discussing the February 2020 gaming events, and whether Mad Dog was a free game during those events."[13] It is of note that in their opening brief on appeal AmVets agrees with this finding of fact by the Board, claiming to have "never suggested that the Mad Dog game played in <u>2020</u> was free."[14]

There is sufficient evidence on the record for the Board to conclude that Mad Dog, as operated by AmVets in 2020, cost five dollars to play and is therefore not a free game.

**B. The Board's decision that AmVets operation of Mad Dog in 2020 was not a raffle because it did not contain the attributes of a raffle set out in Title 28, Chapter 15, Subchapter VII of the Delaware Code is supported by evidence on the record before the Board.**

The record is sufficient for the Board to find that AmVets operation of Mad Dog in 2020 was not a raffle as defined by Delaware law. The record demonstrates that AmVets operated Mad Dog as a bonus hand or extra round of the game Hotshots. "Hotshots is also known as Flip 5 and is generally played with multiple decks of

---

[13] Mar. 2023 at Tr. at 28-29.; *see also* Recommendations of Hr'g Officer at 45-46, Binder 1, Tab D.
[14] Appellant's Opening Br. on Appeal. at *5.

cards shuffled through machines. The players are dealt five cards face down from the multiple decks, and the dealer flips cards over (one-by-one) from his deck and calls out each card. If the player has the called card it can be then be [sic] turned over. The players race to flip all five cards over, and the winner is the first to flip all five cards over in one hand."[15]

In the Mad Dog round of Hotshots "a dealer has one deck of cards and then there are five or six decks that are shuffled that are disseminated to the players. There's a special Mad Dog card pulled by the dealer, and if the player[ is] in - - when their cards are turned over, if they have the Mad Dog card, they have the ability to win the pot because they have the Mad Dog Card."[16]

During their deliberations, the Board utilized its experience and specialized competence to compare Delaware's statutory definitions of a raffle to the rules of Mad Dog. The Board read the language of 28 *Del C.* § 1533 into the record before unanimously concluding that Mad Dog did not comport with the definition of a raffle under Delaware's charitable gaming laws.

---

[15] Recommendations of Hr'g Officer at 44, Binder 1, Tab D.
[16] Mar. 2023 Tr. at 37.

Reviewing the record before the Board and giving deference to their experience and specialized competence there is sufficient evidence to conclude that Mad Dog, as operated by AmVets in 2020, was not a raffle.

**C. The Board's decision that AmVets operation of Mad Dog in 2020 with a progressive jackpot was illegal is not supported by evidence on the record before the Board. Further, Delaware law does not prohibit progressive jackpots in charitable gaming.**

Despite the somewhat convoluted posture of these proceedings, the true issue before the Court is the legality of progressive jackpots in charitable gaming. This Court did not reach a conclusion as to the constitutionality of progressive jackpots in its prior Order and Opinion on this matter because at that time it was not clear if Mad Dog was operated as a free game and therefore not subject to the Boards authority.[17] Having now determined that Mad Dog, as operated by AmVets in 2020 with a progressive jackpot, was not a free game and therefore subject to the Board's authority, this Court can now analyze whether or not progressive jackpots may be operated in charitable gaming. The Board contends that when read in concert, the Delaware Constitution, statutes, and regulations prohibit progressive jackpot games.

---

[17] *AmVets Post No. 2*, 2023 WL 166272, at *7.

AmVets argues that charitable organizations may legally conduct gaming with progressive jackpots.

Reading the Delaware Constitution, the Delaware Code, and the Delaware Administrative Code together it takes extreme interpretive gymnastics by the Board to construe that progressive jackpots games, in the context of charitable gaming, are illegal. Permitting the Board to enforce a patchwork of interpretations resulting in fines and suspensions for AmVets is not tolerable. No mention of progressive jackpots or any similar scheme is made in the Delaware Constitution or any relevant statutes or regulations. To the contrary, Delaware statutes and regulations enable charitable organizations to operate "any game or scheme" as charitable gaming with limited exception.[18] While the Court shows great deference to the decisions of the Board, those decisions must be based on law.

The transcript of the Board's deliberations on remand from this Court show the Board reached its conclusions, not based on experience, specialized competence, or the application of the facts on the record to any law, but rather because the Board believes, "…it doesn't seem like what [AmVets] did was legal."[19] In fact, when Deputy Attorney General Maloney directly asked the Board in their March 2023 deliberations to articulate their reasoning for finding progressive jackpots illegal the

---

[18] 28 *Del. C.* § 1527; 10 *Del. Admin. C.* 103-1.0.
[19] Mar. 2023 Tr. at 53.

11

first response was, "I don't know. I don't. I really don't know."[20] Acting Chairperson Ascione then reasoned that if progressive jackpots were not regulated by the Board, then they were not legal.[21] The other members of the Board eventually came around to support Ascione's reasoning.

Shortly thereafter Board member Gant stated, "If we're wrong then the Court's got to tell us that we're wrong and we've got to do something else,"[22] The Court agrees with this sentiment and will take this time to explain why progressive jackpots are not prohibited in charitable gaming under Delaware law.

**1. The Delaware Constitution does not prohibit the use of progressive jackpots in charitable gaming.**

Article II § 17 of the Delaware Constitution prohibits all forms of gambling in Delaware with limited exceptions.[23] Article II § 17B of the Delaware Constitution carves out charitable gaming as one such constitutionality protected legal exception to the Constitution's general prohibition on gambling.[24] This exception allows charitable organizations such as AmVets to legally operate gaming within the bounds established in Delaware Code and Delaware Administrative Code. The Delaware Constitution, standing alone, does not prohibit progressive jackpots, but it

---

[20] Mar. 2023 Tr. at 63.
[21] *Id.*
[22] Mar. 2023 Tr. at 64.
[23] Del. Const. art. II § 17
[24] Del. Const. art. II § 17B.

commands the General Assembly to regulate charitable gaming which turns our analysis to Chapter 15 of Title 28 of the Delaware Code.[25]

## 2. The Delaware Code does not prohibit the use of progressive jackpots in charitable gaming.

The General Assembly has defined charitable gaming as "*any game or scheme operated by an organization which has been in existence 2 years or longer in which chance is the dominant factor in the game, a consideration is paid to play and a prize may be won…*" (emphasis added).[26]  Mad Dog, as operated by AmVets with a progressive jackpot, falls squarely within this definition.  Chance is a dominant factor in Mad Dog, five dollars consideration was required to play, and the prize of a progressive jackpot may have been won by participants.

The General Assembly "exclude[s] slot machines, roulette, craps or baccarat games," from charitable gaming. [27]  Absent from this list of exclusions are games with progressive jackpots.

Section 1530 of Title 28 further specifies the limits placed on charitable gaming by the General Assembly of which there are two.  Section 1530(a) states, "[i]n charitable gaming, there shall be no limit on the amount a person may bet and no limit on the amount a person may win, except that no person may lose more than

---

[25] Del. Const. art. II § 17B.
[26] 28 *Del C.* § 1527.
[27] *Id*.

$150 in a single day."[28] While §1530(b) states "[n]otwithstanding subsection (a) of this section, in a members-only game, no prize may be offered or given in excess of the sum of $500 in any single game. Only a member who furnishes proof of membership in the organization or parent organization sponsoring the game may participate in a members-only game."[29] Neither of the limitations pertain to progressive jackpots or the way in which AmVets operated Mad Dog.

The Board also argues that 28 *Del. C.* §§ 1521(a)(1) and 1521(a)(4) implicitly prohibit progressive jackpots because they require a reporting of profits and receipts within 30 days of each game. In its relevant portion § 1521 reads:

> "(a) Within 30 days after the conclusion of any game, the organization which conducted the game and its member or members who were in charge shall furnish to the Board a duly sworn statement showing:
>> (1) The gross receipts derived from each game;
>> (4) The net profit derived for each such game;"[30]

The Board reasons that because a progressive jackpot builds over time if a winner is not drawn, AmVets, or any other operator of charitable gaming, could not comply with these accounting requirements. This conjecture is simply not true. This Court has previously "acknowledge[d] that the monies raised from each game need not be donated to charity immediately after the conclusion of the game, [but] the

---

[28] 28 *Del C.* § 1530(a).
[29] 28 *Del C.* § 1530(b).
[30] 28 *Del. C.* § 1521(a).

14

donation amount must be properly delineated on the [After Occasion Report] that is sent to the Board within 30 days."[31]

Charitable gaming operators could comply with the requirements of § 1521 by simply noting on their After Occasion Reports ("AOR") how much jackpot money is being rolled over to the next drawing or game. Section 1521 requires a sworn accounting of each charitable game operated by an organization to be reported to the Board within 30 days of each game. It does not require such reported funds to be deposited somewhere or prohibit such funds from being rolled over, so long as they are faithfully reported to the Board after each game.

AmVets understood this and in trying to comply with the statutory requirements of § 1521 delineated on a February 4th, 2020 AOR how much money from a game of Hotshots was being rolled over into the next game as a progressive jackpot.[32] AmVets handwrote "progressive jackpot" on the AOR before submitting it to the Board.[33] This attempt to comply with § 1521 was eventually used by the Board as evidence against AmVets in this matter.[34]

28 *Del. C.* § 1527 permits "any game or scheme" to be operated by charitable organizations as charitable gaming. The General Assembly codified the limits of

---

[31] *AmVets Post No. 2,* 2023 WL 166272, at *6.
[32] State's Exhibit 12, Tab G.
[33] *Id.*
[34] *Id.*

charitable gaming and declined to limit or prohibit progressive jackpots in sections 1527, 1530, or anywhere else in the Delaware Code. The General Assembly empowered the Board to "[a]dopt, amend and repeal rules and regulations governing the issuance and amendment of permits and licenses to conduct the games under such permits and licenses and schedules of rentals which may be paid for the leasing of equipment for use in connection with the games."[35] Those rules and regulations carry the force of law, therefore our attention will turn next to them.[36]

### 3. The Delaware Administrative Code does not prohibit the use of progressive jackpots in charitable gaming.

Much like the General Assembly, the Board defines charitable gaming as "*[a]ny game or scheme* operated by an organization which has been in existence for two (2) years or longer in which chance is the dominant factor in determining the allocation of a prize."[37] (emphasis added). For the reasons stated above in our analysis of the Delaware Code, Mad Dog as operated by AmVets with a progressive jackpot, falls well within this definition.

Like its statutory counterpart, § 103-1.0 excludes "slot machines, roulette, craps, baccarat games, or raffles as defined in the Board's Regulations for Raffles,"

---

[35] 28 *Del. C.* § 1508(a)(2).
[36] *Id.*
[37] 10 *Del. Admin. C.* 103-1.0.

from its definition of charitable gaming.[38] As stated above, the Board unanimously determined that Mad Dog as operated by AmVets with a progressive jackpot was not a raffle. This factual determination is supported by substantial evidence on the record before the Board and neither the Court nor AmVets contest this finding. To quote the Board, "[s]o I believe it is not a raffle. So, then it would have to be progressive jackpot of which we do not have regulations for, right?"[39]

4. **When read together the Delaware Constitution, Delaware Code, and Delaware Administrative Code do not prohibit the use of progressive jackpots in charitable gaming.**

A thorough examination of the Delaware Constitution, the Delaware Code, and the Delaware Administrative Code yield no prohibition on progressive jackpots in charitable gaming. The Board's conclusion that progressive jackpots fall under the Delaware Constitution's general prohibition on gambling because they are not regulated is unsupported by the record before the Court. It is obvious that the Board must provide explicit descriptions and definitions of prohibited conducted before violations and penalties are issued. Aside from the limited list of enumerated exclusions, both the statutes and the regulations governing charitable gaming allow for "any game or scheme" to be charitable gaming. When operated by a charitable

---

[38] 10 *Del. Admin. C.* 103-1.0; 28 *Del. C.* § 1527.
[39] Mar. 2023 Tr. at 56.

17

organization falling under the exclusion to Delaware's general prohibition on gambling, games that utilize a progressive jackpot are "any such game or scheme" and are therefore permitted under Delaware law.

## V. CONCLUSION

The Board erred in its conclusion that progressive jackpots are illegal in charitable gaming. The March 2023 deliberation transcript demonstrates that the Board's finding was not supported by the record, but instead by the longstanding opinion of the Board that progressive jackpots have always been illegal under their extreme and impermissible statutory interpretations. Reasoning inductively from their conclusion, the Board developed the position that if they did not specifically regulate progressive jackpots, they must be illegal. As demonstrated above, this reasoning is inconsistent with the Delaware Constitution, Delaware Code, and Delaware Administrative Code. This Court's finding that progressive jackpots are not prohibited requires the Board to reassess their findings of fact and imposition of discipline against AmVets.

For the reasons set forth above, portions of the Board's conclusions of fact and law are free from legal error and supported by substantial evidence. For the reasons enumerated in our January 12th, 2023 Opinion and Order, Violations 1, 3, and 4, as set out in the Board's April 26th, 2023, Order are **AFFIRMED.**

18

Conversely, for the reasons set forth above, the Board's finding that AmVets violated 28 *Del. C*. §1521(a)(1), § 1521(a)(4) and Board Regulation 11.4.3 are not free from legal error. Therefore, those findings as well as the discipline and fines imposed by the Board and are **REMANDED TO THE BOARD FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

/s/ *Mark H. Conner*

Mark H. Conner, Judge

cc: Prothonotary